ALFRED H. AND FRANCES TURECAMO, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5441-72.    Filed July 30, 1975.

Alfred H. Turecamo, pro se.
*L. William Fishman,* for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in petitioners' income tax for the calendar year 1970 in the amount of $1,043.48.

The issues for decision are:

(1) Whether petitioners contributed more than half of the support of the mother of one of them during the calendar year 1970 so as to be entitled to a dependency exemption for her and a medical expense deduction for medical expenses they paid for her where the total support payments made on her behalf by petitioners were less than her hospital expenses which were paid by medicare allowances.

(2) Whether petitioners are entitled to a deduction for a casualty loss of $375 as a result of damage to their automobile.

#### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners husband and wife, who resided in Douglaston, N.Y., at the time their petition in this case was filed, filed a joint Federal income tax return for the calendar year 1970 with the District Director of Internal Revenue, Brooklyn District, New York.

Frances Kavanaugh, the mother of Frances Turecamo and the mother-in-law of Alfred H. Turecamo, who was 81 years old

during the calendar year 1970, began living with petitioners prior to the beginning of the calendar year 1970. Mrs. Kavanaugh, during the calendar year 1970, received $1,140 in social security benefits. During this year petitioners provided Mrs. Kavanaugh with two and one-half rooms in their home which she used as her apartment. They maintained a telephone in these rooms for Mrs. Kavanaugh's use. During the time that Mrs. Kavanaugh was residing in petitioners' home, they provided her meals which she ate with petitioners' family. They provided the furnishings in Mrs. Kavanaugh's rooms including a television set, some clothing for Mrs. Kavanaugh, and occasional entertainment. Mrs. Kavanaugh did not reimburse petitioners for any of the support furnished to her but used the amount she received from social security for her own support as she saw fit. The total amount contributed by petitioners toward Mrs. Kavanaugh's support through the furnishing of an apartment, food, clothing, and entertainment for her was approximately $4,000.

On August 5, 1970, Mrs. Kavanaugh was admitted to the Long Island Jewish Hospital in New Hyde Park, Long Island, New York, and was discharged from the hospital on October 9, 1970. Her total hospital charges while she was in the hospital were $11,095.75, of which $10,434.75 was discharged by "Medicare allowances," which benefits were payments which were made pursuant to the provisions of "Part A—Hospital Insurance Benefits for the Aged," 42 U.S.C., ch. 7, sec. 1395c, amending tit. XVIII of the Social Security Act.

In addition to hospital costs, Mrs. Kavanaugh's condition required nursing care. During the calendar year 1970, petitioners expended $3,531 for hospital and nursing care for Mrs. Kavanaugh. Mrs. Kavanaugh died in the early part of December 1970.

On their joint Federal income tax return for the calendar year 1970, petitioners claimed a dependency exemption for Mrs. Kavanaugh and claimed $3,531 as deductible medical expenses which they paid on behalf of Mrs. Kavanaugh in the year 1970. The total medical expenses claimed by petitioners amounted to $4,017 from which they subtracted $674 as representing 3 percent of their reported adjusted gross income, leaving a medical expense deduction claimed by them of $3,343.

Respondent in his notice of deficiency disallowed petitioners' claimed dependency exemption for Mrs. Kavanaugh, stating that

petitioners had not established that Mrs. Kavanaugh had qualified as their dependent under sections 151 and 152, I.R.C. 1954.[1] Respondent also disallowed petitioners' claimed medical expense deduction of $3,343 with the explanation that it had not been established that this amount was expended for the purposes designated.

In August 1970 petitioners had their 1966 Chrysler Newport sedan automobile, which they had purchased new in 1966 for approximately $3,600, parked in the parking area of the shopping center in Douglaston, N.Y. Upon returning to the car petitioners found that both doors and one fender on the car had been badly smashed. No note or any other indication was left on the car to show by whom or how the damage was caused. Petitioners had no insurance on the car. They had the car repaired at a cost of between $475 and $500.

Petitioners on their income tax return for the calendar year 1970 claimed a casualty loss deduction of $375.

Respondent in his notice of deficiency disallowed the claimed $375 casualty loss which petitioners claimed as resulting from damage to their automobile, stating that it had not been established that any deductible loss had been sustained.

### OPINION

Respondent's primary position is that the amounts paid as basic medicare benefits under part A—"Hospital Insurance Benefits for the Aged" of the Social Security Act are in the nature of disbursements made in furtherance of the social welfare objectives of the Federal Government; and, therefore, in determining whether the individual for whom the medicare benefits are paid is a dependent of another, these payments, though not includable in the gross income of the recipient, should be viewed as amounts paid by the recipient for his own support just as are social security benefits. Respondent distinguishes the payments under part B from those under part A and states that in his view payments made under part B are in the nature of health insurance benefit payments and therefore are not a part of the support of the person for whom made.[2]

---

[1] All references are to the Internal Revenue Code of 1954.

[2] Respondent relies primarily on his Rev. Rul. 70-341, 1970-2 C.B. 31, which holds that basic medicare benefits under part A of tit. XVIII of the Social Security Act as amended (42 U.S.C. sec. 1395), are in the nature of social security payments and are not includable in an individual's taxable income because of this reason, and that payments under part B of

Petitioners take the position that medicare payments made on behalf of an individual to a hospital under part A are health benefit insurance payments just as are payments made under part B or any private insurance program. In support of their position petitioners point to the provisions of sections 3101(b) and 3111(b) of the 1954 Internal Revenue Code, both of which are entitled "Hospital Insurance," the former providing for a tax on the income of every individual equal to stated percentages of his wages, and the latter providing for an excise tax on the employer based on a percentage of his employees' wages and to title 42, section 1395i (entitled "Federal Hospital Insurance Trust Fund") of the United States Code which provision is in part A of subchapter XVIII of the Social Security Act as amended. This section provides for the creation of a "Federal Hospital Insurance Trust Fund" with the amounts received from the taxes imposed by sections 3101(b) and 3111(b) of the Internal Revenue Code.

Petitioners further point to the testimony of an expert witness offered by respondent to the effect that the basic medicare program is not a need or welfare program but a work-oriented insurance program provided without regard to means for those

tit. XVIII of the Social Security Act as amended are in the nature of health or accident insurance payments and are not includable in the recipient's income because of the provisions of sec. 104(a), I.R.C. 1954. The revenue ruling then holds that in determining the amount that an individual contributes to his own support for the purpose of ascertaining whether he is the dependent of another person under secs. 151 and 152, I.R.C. 1954, medicare payments under part A are considered support furnished by the individual for himself but such payments under part B are not so considered. In this regard the revenue ruling states:

"With respect to the personal or dependency exemption aspect of this matter, a taxpayer is generally permitted, pursuant to section 151 and section 152 of the Code, to claim a qualified individual as a dependent provided that he furnishes over half of the support of such individual for the year involved. In computing the amount that is contributed to the support of the individual, there must be included any amount that is contributed by such individual for his own support, including amounts that are ordinarily excludable from gross income such as social security payments. For example, Revenue Ruling 57-344, C.B. 1957-2, 112, holds that child insurance benefits under title II of the Social Security Act received and used for the support of a child are considered the child's contribution to his support in determining who furnished more than one-half of the child's support. Likewise, it is held that basic medicare benefits received by (or on behalf of) an individual are includible as the individual's own contribution to his support in determining who provided more than one-half of his support.

"Conversely, supplementary medicare benefits, being in the nature of medical insurance proceeds, are not includible in the support computation of the individual by whom (or on whose behalf) they were received. However, the premiums paid for supplementary medicare coverage are includible in the support computation and are attributable to the person who furnishes the premiums. Revenue Ruling 64-223, C.B. 1964-2, 50."

persons who qualify for the benefits based on work done either by them or their spouses.

Respondent's argument in summary is that since the basic medicare benefits provided for under part A of title XVIII of the Social Security Act as amended are financed by taxes, which taxes are not stated in section 213(e) [3] to constitute amounts paid

---

[3] Secs. 213(a) and 213(e)(1), I.R.C. 1954, provide as follows:

(a) ALLOWANCE OF DEDUCTION.—There shall be allowed as a deduction the following amounts, not compensated for by insurance or otherwise—

(1) the amount by which the amount of the expenses paid during the taxable year (reduced by any amount deductible under paragraph (2)) for medical care of the taxpayer, his spouse, and dependents (as defined in section 152) exceeds 3 percent of the adjusted gross income, and

(2) an amount (not in excess of $150) equal to one-half of the expenses paid during the taxable year for insurance which constitutes medical care for the taxpayer, his spouse, and dependents.

* * *

(e) DEFINITIONS.—For purposes of this section—

(1) The term "medical care" means amounts paid—

(A) for the diagnosis, cure mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body,

(B) for transportation primarily for and essential to medical care referred to in subparagraph (A), or

(C) for insurance (including amounts paid as premiums under part B of title XVIII of the Social Security Act, relating to supplementary medical insurance for the aged) covering medical care referred to in subparagraphs (A) and (B).

H. Rept. No. 213, to accompany H.R. 6675 (Social Security Amendments of 1965), 89th Cong., 1st Sess. (1965), 1965-2 C.B. 733, 742-745, stated as follows:

2. GENERAL REASONS FOR PROVISION

The health care provisions of your committee's bill have a relationship to the medical expense deductions allowed under the Internal Revenue Code. The 3-percent limitation in the case of medical care expenses and the 1-percent limitation applied to expenditures for medicines and drugs were waived for persons 65 or over in recognition of the fact that medical expenses generally constituted a heavy financial burden for older people. The limitations were waived, however, during a period when there was no broad-coverage health insurance plan for older persons. The insurance provisions of your committee's bill are designed to meet these problems. The reasons for the special medical expense provisions in the tax law for the relief of older taxpayers, therefore, no longer appear to exist.

Moreover, restoration of a uniform floor to be applied in the computation of the medical expense deduction will provide an increase in revenue which will help defray to some degree the cost of the general fund of the voluntary insurance provisions in your committee's bill. Only in the case of an older person with sufficient income to be taxable will the benefit of the Federal Government's $36-per-year contribution towards his voluntary medical insurance coverage be reduced or offset by a lesser deduction for medical care expenses. * * *

* * *

The bill further provides that all taxpayers itemizing their deductions, regardless of age, are to be granted a deduction, without regard to the 3-percent floor, for one-half the cost of medical care insurance for the taxpayer, his spouse, and his dependents, but not to exceed $250. The other half of any premiums paid, plus any excess over the $250 limit for medical care insurance, will continue to be subject to the 3-percent floor and only when they plus any other allowable medical expenses exceed 3 percent of adjusted gross income will they be deductible. Included in the category of medical insurance premiums which may be deducted (one-half under, and one-half apart from, the 3-percent floor) are those for supplementary health insurance benefits for the aged but not the taxes transferred to the

for health insurance, benefits received by an individual through payment of hospital costs on his behalf by basic medicare should be considered a part of his support.

Respondent concludes from his ruling (Rev. Rul. 66-216, 1966-2 C.B. 100) that premiums paid by an individual under part B of title XVIII of the Social Security Act as amended are part of deductible medical expenses under section 213, and it therefore follows that the payments made on behalf of an individual under part B are not to be included in the amount furnished by that individual for his own support for the purpose of the dependency exemption provided under sections 151 and 152.[4]

---

trust fund for hospital insurance benefits for the aged.
* * *

Under the new paragraph (1), subparagraphs (A) and (B) are the same as existing law except for the elimination of the phrase "including amounts paid for accident or health insurance". Under the new subparagraph (C), amounts paid for an insurance contract are included within the definition of medical care only to the extent that the premiums are attributable to insurance covering medical care (as defined in subparagraphs (A) and (B) of section 213(e)(1)). In determining whether a contract constitutes an "insurance" contract, it is irrelevant whether the benefits are payable in cash or services. Under the new paragraph (1)(C), premiums paid under part B of title XVIII of the Social Security Act (relating to supplementary health insurance for the aged) are amounts paid for insurance. Taxes paid under section 1401 (relating to tax on self-employment income) or under section 3101 (relating to tax on income of employees) of the Internal Revenue Code do not constitute amounts paid for insurance.

S. Rept. No. 404, to accompany H.R. 6675 (Social Security Amendments of 1965), 89th Cong., 1st Sess. (1965), 1965-2 C.B. 758, 764, contains substantially the same statement as the last paragraph quoted above.

Respondent in Rev. Rul. 66-216, 1966-2 C.B. 100, held, based on the provisions of sec. 213(e), I.R.C. 1954, and the above-quoted legislative history, that the payments by an individual under part B of the Social Security Act as amended are deductible medical expenses but that the taxes collected to finance part A are not.

[4] Respondent relies on his Rev. Rul. 64-223, 1964-2 C.B. 50, 51, in support of his position. After reciting that medical and dental expenses are a part of support of an individual under the provisions of sec. 1.152-1(a)(2)(i), Income Tax Regs., this ruling states:

(1). Where the taxpayer or the individual is covered under a renewable term policy which provides insurance against the cost of medical care (whether payment is made directly to hospitals and doctors or reimburses the policyholder), the policyholder will be considered as having furnished the care since the policyholder, under a privately financed medical insurance plan, is regarded as providing medical care for himself and the other beneficiaries of the policy. In determining (a) the total amount of support of the individual, and (b) the amount contributed to support by the individual himself or by the taxpayer claiming him as a dependent, the amount paid by the insurance company should be disregarded and only the premiums paid on the policy and the unreimbursed portion of the expenses for medical care should be taken into account.

Section 213(e) of the Code as cited above, indicates that amounts paid for accident or health insurance constitute "medical care." The inclusion in the computation of support of such payments has been recognized by the Tax Court in several cases, although the precise question has never been presented. *Lena Hahn,* 22 T.C. 212 (1954); *Donald Lopez,* T.C. Memo 1959-9; *James Parker,* T.C. Memo 1959-182; *William Peery,* T.C. Memo 1962-202; *John J. Mora,* T.C. Memo 1964-122. Recently, the United States District Court for

We have in a number of cases recognized that medical expense is a part of an individual's support and have held premiums paid for medical insurance to be a part of medical expense for support determinations. See *Warren C. Mawhinney*, 43 T.C. 443 (1965), affd. per curiam 355 F. 2d 462 (3d Cir. 1966), in which we listed medical fees, medicines, and health insurance payments, all as part of the support of the taxpayer's children.

In our view it is clear that hospital expenses are medical expenses which form a part of an individual's support. If the expenses are paid and not covered by any form of insurance, there would appear to be no question that the person paying the hospital expense has contributed the amount of the payment to the support of the individual for whom the payment is made. The problem is how should such expenses paid by insurance be treated and should medicare payments made under part A be treated as other insurance payments.

We agree with petitioner that no valid basis exists for distinguishing between the hospital insurance benefit payments made under part A of title XVIII of the Social Security Act as amended and the medical benefit payments made under part B of that Act or some form of private insurance policy for determining the total support of an individual for the purposes of sections 151 and 152. The fact that the part A benefits are financed by a tax

the Northern District of Georgia held in *Samples* v. *United States,* 226 Fed. Supp. 115 (1963) that the benefits received under a health policy must be included in support in determining dependency. The question now presented is whether the premiums paid and the benefits received should be included in support. In considering the question, the Service has reached the conclusion that to include both premiums and benefits in support would in essence be duplication and that the cost of the insurance is the proper amount to be included. Accordingly, the *Samples* case will not be followed.

(2). Where an individual incurs medical expenses as a result of an automobile accident for which he is reimbursed (i) through insurance carried by the person who is at fault (the tort-feasor) or (ii) directly by the tort-feasor, no part of the amount so paid will enter into the computation of support in determining dependency. The amount paid by the insurance company or the tort-feasor is not considered as support provided by them because this amount is paid in release and satisfaction of a legal claim for an injury to the person of the individual involved and in no way resembles an item of support.

(3). Under the provisions of the Dependents' Medical Care Act of 1956, as amended, 10 U.S.C. 1071, dependents of members of the uniformed services are entitled to receive medical care in medical facilities of the United States Government. The term "uniformed services" means the armed forces and the Commissioned Corps of the Coast and Geodetic Survey and of the Public Health Service. The hospitalization and medical care furnished to the dependent of a member of the uniformed services is furnished because of the member's employment and, therefore, its cost is considered as provided by the member. However, since that member did not incur any expense in connection with the furnishing of such medical services, he is not to be credited with having furnished the dollar value of such services as an item of support in determining dependency under section 152 of the Code.

imposed and withheld from the wages of all individuals to whom the tax applies[5] without the necessity of their consent does not distinguish the nature of the payments made under the basic medicare provisions for hospital benefits from payments made under a program carried voluntarily by an employer for an employee or by an individual voluntarily for himself, either under part B of title XVIII of the Social Security Act as amended which is partially financed from the general funds of the Federal Government or with a private insurance company. Part A, as well as part B, of title XVIII of the Social Security Act as amended pays benefits only under the conditions specified therein.[6]

Private insurance carried for an individual either by his employer or in a private policy carried by the individual himself pays benefits only under the contractual conditions specified. The part A and part B medicare provisions, as well as private health insurance contracts, pay only for the risks insured against, which

---

[5] We are aware that when the medicare provisions first became effective part A covered individuals who were already 65, even though they were not entitled to social security benefits. Respondent makes no point of this one-time coverage but relies merely on the distinction he makes of a tax collected to cover the benefit payments as compared to a "voluntary premium payment."

[6] 42 U.S.C. sec. 1395d, provides:

Sec. 1395d. Scope of benefits

(a) The benefits provided to an individual by the insurance program under this part shall consist of entitlement to have payment made on his behalf or, in the case of payments referred to in section 1395f(d)(2) of this title to him (subject to the provisions of this part) for—

(1) inpatient hospital services for up to 150 days during any spell of illness minus 1 day for each day of inpatient hospital services in excess of 90 received during any preceding spell of illness (if such individual was entitled to have payment for such services made under this part unless he specifies in accordance with regulations of the Secretary that he does not desire to have such payment made);

(2) post-hospital extended care services for up to 100 days during any spell of illness; and

(3) post-hospital home health services for up to 100 visits (during the one-year described in section 1395x(n) of this title) after the beginning of one spell of illness and before the beginning of the next.

Sec. 1395k of 42 U.S.C., provides:

Sec. 1395k. Scope of benefits; definitions

(a) The benefits provided to an individual by the insurance program established by this part shall consist of—

(1) entitlement to have payment made to him or on his behalf (subject to the provisions of this part) for medical and other health services, except those described in paragraph (2)(B); and

(2) entitlement to have payment made on his behalf (subject to the provisions of this part) for—

(A) home health services for up to 100 visits during a calendar year;

(B) medical and other health services (other than physicians' services unless furnished by a resident or intern of a hospital and the services for which payment may be made pursuant to section 1395n(b)(2) of this title) furnished by a provider of services or by others under arrangements with them made by a provider of services; and

(C) outpatient physical therapy services.

basically are when hospital or medical treatment is required by an individual. All of these insurance agreements pay for medical costs.

The fact that Congress chose to allow a medical expense deduction under section 213 for the part B premium payments but not for the tax paid to finance part A, has no bearing on the nature of the benefits paid when the risk insured against occurs. There is no necessary correlation between section 213 and sections 151 and 152. Likewise, respondent's so-called "duplication" theory of including in support both premium payments for health insurance and the benefits paid by the insurance does not find support in sections 151 and 152. The premiums may well be paid in a different year from that in which the benefits are received (see section 213(e)(3) allowing deduction for premiums paid for prepaid medical insurance under certain circumstances) and certainly in many instances the benefits received in 1 year from the insurance often exceed by many times the total of premiums paid for all prior years during which the insurance was carried. Respondent apparently makes no distinction between health benefits furnished by an employer received in a particular year and payments made by a private insurance contract or part B of Medicare, even though in his Rev. Rul. 64-223, 1964-2 C.B. 50, he holds that since certain employees incur no "cost" from employer-furnished medical services, there is no amount to include as support of a dependent from such medical services being available to the dependent from another's employment.

In our view none of the distinctions which respondent attempts to make between benefits paid by part A medicare and other forms of health or medical insurance is valid.

Respondent bases his position in this case solely on his distinction between hospital cost payments made under the basic medicare provisions of part A of title XVIII of the Social Security Act as amended and those made under part B of that Act or a private insurance policy. Since respondent clearly concedes that part B or private insurance payments are not includable in determining the support furnished to an individual and we conclude that there is no proper basis for distinguishing these payments from payments made under part A of Medicare, we will not consider whether all such payments should be included as part of an individual's support. Therefore, we hold that under the facts

here present, petitioners contributed over one-half of Mrs. Kavanaugh's support in 1970 and are entitled to their claimed dependency exemption for her and to include the medical expenses they paid for her in computing their medical expense deduction for 1970.

The issue with respect to the casualty loss claimed by petitioners because of damage to their automobile is purely factual. Section 165(c)(3) allows an individual to deduct losses of property not connected with a trade or business if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. Damage to an automobile which occurred while the automobile was parked for a short time in a parking lot has generally been recognized as an "other casualty." Respondent does not contend to the contrary, but rather argues that petitioners have not carried their burden of proof with respect to the amount of deduction to which they are entitled. Respondent points out that a casualty loss deduction is limited to the lesser of the adjusted basis of the property or the amount by which the fair market value of the property immediately before the casualty exceeds the fair market value of the property immediately after the casualty. Respondent argues that petitioners have failed to show either the fair market value of their automobile before the casualty or after the casualty.

Petitioner Alfred H. Turecamo testified that he paid $3,600 for his automobile, and he estimated that before the casualty the automobile had a fair market value of between $1,200 and $1,500. Petitioner argues that the fair market value of the automobile would be reduced by the casualty by at least the amount required to have the damage repaired. Section 1.165-7(a)(2)(i) and (ii), Income Tax Regs., provides the method of valuation of property involved in a casualty. While providing that generally a competent appraisal must be obtained of the fair market value of the property immediately before and immediately after the casualty, the regulation further states that the cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that the repairs are necessary to restore the property to its condition immediately before the casualty; the amount spent for the repairs is not excessive; the repairs do not cover more than the damage suffered; and the value of the property after the repairs does not as a result of the

repairs exceed the value of the property immediately before the casualty.

While the evidence in this case is not as strong as might have been desirable, the testimony of Alfred H. Turecamo in our view is in all respects truthful. Petitioners were not represented by counsel. It is clear from the record that petitioners spent between $475 and $500 in repairs to their automobile. Alfred Turecamo also testified that he had an argument with the person who repaired the automobile concerning the quality of the work. Taking the testimony as a whole, in our view, it is sufficient to support a claimed casualty loss of $475 which is deductible to the extent of $375. We therefore sustain petitioners' claimed casualty loss deduction of $375.

*Decision will be entered for the petitioners.*

Reviewed by the Court.

WILBUR, *J.,* concurring: The respondent has ruled that the premiums paid for health insurance, rather than the benefits paid by the insurance plan, are the amounts to be included in support for determining who is entitled to a dependency exemption. Rev. Rul. 64-223, 1964-2 C.B. 50. While a good argument can be made that this position corresponds with the economic realities,[1] the validity of this revenue ruling is not before us and was never an issue in these proceedings. This case was tried and briefed solely on the validity of the Government's position that the hospital insurance benefits of part A of title XVIII of the Social Security Act are not insurance, while the supplementary medical insurance benefits of part B are insurance.[2] The respondent's case must, therefore, stand or fall on his assertion that part A is a severable and distinct part of the program of "Health Insurance for the Aged and Disabled" established by title XVIII (including parts A, B, and C), and that the severed portion is not insurance.

---

[1] No prudent man with the means and opportunity to acquire health insurance will fail to do so with the enormous costs of health care today. The average man looks at his health costs as his insurance premiums plus his unreimbursed payments for health care, which accords with the economic realities (and the amount deductible as a medical expense). Viewing large third-party payments (made when the contingency insured against occurs) as support can be viewed as distorting the economic realities.

[2] References to part A, part B, and part C are to tit. XVIII of the Social Security Act, as amended, 42 U.S.C. sec. 1395. Tit. XVIII was added to the Social Security Act by Pub. L. 89-97 (1965), 79 Stat. 286.

The Government's position is purely and simply at odds with the history and structure of the program of health insurance for the aged and disabled.[3] The original Committee on Economic Security considered the issue of health insurance for the aged along with Social Security. The report of the committee sent to Congress on January 17, 1935, discussed general principles and promised further efforts to develop a health insurance plan, but specific recommendations were not included for tactical reasons, although a report was subsequently filed.[4] From the mid-thirties to the mid-sixties when the present program was enacted, a series of bills were introduced and reintroduced embodying provisions similar to those found in part A of title XVIII.[5] These bills were drafted to provide a public health insurance program for the aged. This is in fact what title XVIII of the Social Security Act accomplishes, by providing an integrated program of inpatient and outpatient benefits that must be looked at as a whole for purposes of the issue we face.

Parts A and B are intertwined and interdependent components of a single comprehensive health insurance plan. Like comprehensive health insurance plans underwritten by private insurers, it provides inpatient hospital services (part A) and outpatient hospital services (part B), physicians' services (part B), care in an extended care facility (part A), and home health services (both part A and part B). Part C (ignored by respondent) provides a common definition of all the critical terms (various providers, services covered, reimbursement methods, etc.) applicable to *both* parts A and B. For example, a home health agency is defined in section 1861(o) (42 U.S.C. sec. 1395x(o)) and home health services are defined in section 1861(m) (42 U.S.C. sec. 1395x(m)). This definition is applicable whether the services are provided under part A (within 1 year of an individual's discharge from a hospital or skilled nursing facility) or under part B. Similarly a provider—such as a hospital or a home health agency (see sec. 1861(u), 42 U.S.C. sec. 1395x(u))—is reimbursed on a reasonable cost basis as that term is defined in section 1861(v) (42 U.S.C. sec. 1395x(v)), regardless of whether the services are provided under part A or part B.

---

[3] The disabled were first covered under Pub.L. 92-603 (1972), 86 Stat. 1329.

[4] See Witte, The Development of the Social Security Act (University of Wisconsin Press 1962); Sydenstricker, "Public Health Provisions of the Social Security Act," 3 Law and Contemporary Problems 263, 264 (1936).

[5] See, for example, H.R. 1 and S. 1, 89th Cong., 1st Sess. (1965) (King-Anderson bill).

Similarly, provisions relating to Federal interference in the practice of medicine, free patient choice, and the option to obtain other health insurance (secs. 1801, 1802, and 1803, 42 U.S.C. secs. 1395, 1395(a), 1395(b)) are common to both parts A and B. Sections 1862-1879 (42 U.S.C. secs. 1395y-1395pp) contain a number of provisions common to both part A and part B, including inter alia, such basic provisions as exclusions from coverage (sec. 1862, 42 U.S.C. sec. 1395y), the Health Insurance Benefits Advisory Council or HIBAC (sec. 1867, 42 U.S.C. sec. 1395dd), Appeals (sec. 1869, 42 U.S.C. sec. 1395ff), Over-payments (sec. 1870, 42 U.S.C. sec. 1395gg), Payments to Health Maintenance Organizations or H.M.O.'s (sec. 1876, 42 U.S.C. sec. 1395mm), Penalties (sec. 1877, 42 U.S.C. sec. 1395nn), and Limitations on Beneficiary Liability where "Medicare" claims are disallowed (sec. 1879, 42 U.S.C. sec. 1395pp). In fact, the very term "Medicare" is commonly used to denote the entire title XVIII program of comprehensive benefits provided by parts A, B, and C.

Like medicare, most comprehensive health plans can be divided into two aspects, the provisions relating to inpatient hospital services and those relating to physician's services and other health services provided on an outpatient basis. The latter are generally subject to a deductible and coinsurance factor to net out administrative expenses attributable to small claims and to provide cost disincentives to overutilization. Indeed, the two major plans offered to Federal employees under the Federal Employees Health Benefits Act of 1959,[6] after which major features of the medicare program were patterned, contain these characteristics.[7] In recognition of the similarity of Medicare to

---

[6] 73 Stat. 708, 5 U.S.C. sec. 8904.

[7] That the annual deductible (currently $60) and the 20-percent coinsurance attributable to medical care on an outpatient basis is very similar to the two major high option plans offered to Federal employees by private insurers is no surprise, since Medicare was patterned after these plans. An alternative to Medicare considered by Congress in 1965 was explained by its sponsor as follows:

"The substitute adopts the approach used by the private insurance industry and it is patterned after the system of insurance that we have provided for our own Federal employees. The benefits are patterned on the high option of the Government-wide indemnity contract negotiated between the Civil Service Commission and private carriers for the benefit of Federal employees. Remarks of Mr. Byrnes, 111 Cong. Rec. 7220 (1965)."

The floor manager of the bill that became Medicare stated that, with regard to health insurance, the substitute bill incorporated "everything that is within the committee bill except with respect to the one matter of how do we finance the cost of taking care of this problem." Remarks of Mr. Mills, 111 Cong. Rec. 7213 (1965).

private health insurance plans, claims administration was delegated to private insurance companies (carriers and fiscal intermediaries) to utilize their ongoing experience with very similar health insurance plans.

It is true that these two features of medicare are financed through different trust funds and different revenue sources, the trust fund revenue for part A resulting from payroll taxes on employers, employees, and the self-employed (as well as some general revenue financing for gratuitous wage credits provided certain military personnel), and the trust fund revenues for part B coming one-half from premium contributions made by enrollees and one-half from general Federal revenues. But this financing disparity, resulting from the historical development of the legislation within Congress in 1965 and associated political exigencies,[8] does not obscure the insurance character of the system: pooling of risks; specified benefits payable on specified contingencies; benefits payable as a matter of right to those in an insured status; and contributions imposed in accordance with actuarial methods designed to insure actuarial soundness. An integrated public health insurance program, modeled after those made available by the private sector, should not be fragmented into its component fragments any more than the private prototypes.

Respondent nevertheless asks us to treat the comprehensive health insurance plan provided by medicare as two distinct and separate plans—parts A and B (ignoring part C), and declare that part A is not insurance. For the reasons stated above, the program cannot be looked at in fragmented components for purposes of the issue presented in this case.

Even if we accepted respondent's attempt to sever part A from the integrated program provided by title XVIII, he errs in characterizing part A as social "welfare" rather than insurance. Respondent bases his refusal to recognize part A as insurance

---

[8] There was a desire to use both general revenue and payroll tax financing; the latter to enable individuals to prepay during their working years the costs of hospital expenses in their later years, which was thought to represent the major health costs of the elderly. Additionally, it was felt that physicians would be less apprehensive of Government interference if their fees were not paid from payroll taxes. Also, part B, as developed within the Congress, enabled physicians to be reimbursed on the basis of reasonable charges—the physicians' customary charge limited by that prevailing in the locality for similar services. (The current provisions, somewhat modified since 1965, are found in secs. 1833(a)(1), 1395 1(a), and 42 U.S.C. secs. 1842(b)(3), 1395u(b)(3)). See Remarks of Mr. Mills, 111 Cong. Rec. 7213, 7214 (1965). The development of the bill is briefly recounted in Manley, The Politics of Finance 118-121 (Little, Brown 1970).

(while admitting that part B is insurance) on three factors: (1) Part A is, like the cash benefits program established by title II of the Social Security Act, a social "welfare" program; [9] (2) part A is a compulsory program financed by a payroll tax, while part B is a voluntary program financed by general revenues and contributions made by electing participants; (3) payroll taxes paid for health insurance are not deductible as medical expenses under section 213 of the Internal Revenue Code of 1954 while the contributions made by those participating in part B are deductible under that section. None of these distinctions are valid.

The decisions respondent cites holding that welfare benefits— either cash or in the form of medical assistance—are includable in determining support (see *Helen M. Lutter,* 61 T.C. 685 (1974), affd. per curiam 514 F. 2d 1095 (7th Cir. 1975)), are clearly irrelevant to the issue herein presented. *Lutter* involved cash payments pursuant to the program of Aid to Families with Dependent Children (A.F.D.C.) established by title IV of the Social Security Act. This is a welfare program entirely different from the insurance programs established by title II and title XVIII of the Social Security Act. A.F.D.C. is a welfare program for *needy* families with dependent children (secs. 401, 42 U.S.C. sec. 601, and 402(a), 42 U.S.C. sec. 602), and can only be paid in accordance with need standards established by each State in accordance with general provisions included in the Federal law (see sec. 402(a)(7) and (8), 42 U.S.C. sec. 602(a)(7)(8)).

*Lutter* also involved payments of medical assistance pursuant to the Federal-State matching programs established by title XIX of the Social Security Act (42 U.S.C. sec. 1396). These payments can only be made to individuals already receiving a cash grant under one of the applicable public assistance programs (such as A.F.D.C. which is based on need) and to certain medically needy individuals who need help with their medical expenses, but not their basic living expenses. (Sec. 1902(a)(10), 42 U.S.C. sec. 1396a(a)(10).) Again, for the latter group, the States must establish need standards in accordance with general criteria in the Federal law (sec. 1902(a)(17), 42 U.S.C. sec. 1396a(a)(17)) and their need standards must be related to those used to

---

[9] Respondent vastly oversimplifies this program. See Meyers, Social Insurance and Allied Government Programs 8 (Irwin 1965). See also Meyers, Medicare 87 (Irwin 1970).

establish eligibility for cash grants (sec. 1903(f), 42 U.S.C. sec. 1396b(f)).

There is no need standard imposed in determining eligibility for either social security or medicare. The wealthiest man qualifies for benefits if he meets the insurance requirements; the poorest individual is ineligible if he fails to meet the insurance requirements.[10]

Anyone with a passing acquaintance with health insurance for the aged knows that the whole program was designed to avoid a means test that was applicable to the existing program for medical assistance to the medically indigent elderly. Respondent confuses the concept of social welfare underlying a *portion* of the cash benefit formula in the social security program established by title II, and in a non sequitur, attempts to characterize part A of title XVIII (as fragmented from its related parts) as welfare. It is true that the benefit structure for cash payments is based on principles of individual equity and social adequacy.[11] While benefits are wage-related to provide individual equity, the benefit formula is weighted, a minimum benefit is provided, and benefits are provided for certain dependent relatives (such as a wife and dependent children) to insure social adequacy. These concepts do not destroy the insurance character of cash benefits under Social Security.[12] Even if they did, they have much less relevance to the hospital insurance benefits provided by part A, wherein each beneficiary receives the actuarial value of the insurance protection provided, rather than a cash benefit that varies greatly as between individuals. Individuals who are not covered under part A can now elect coverage for a premium contribution that is currently a flat rate of $40 per month.[13] The numerous variations in benefits based on social adequacy in the cash program is simply not applicable to the hospital insurance protection provided by part A of title XVIII.

Respondent's analogy of the hospital insurance program to social security cash benefits is wrong for an additional reason. It

---

[10] There were transitory provisions in 1965 covering those who did not have an opportunity to meet the insurance requirements because of their advanced age, but these provisions were not based on any standard of need and respondent does not make an issue of these provisions in this case.

[11] See Meyers, Social Insurance and Allied Government Programs 25, 26 (Irwin 1965).

[12] Benefits are still paid as a matter of right to individuals in an insured status and the benefit formula is wage-related. See sec. 215 (42 U.S.C. sec. 415); Meyers, *supra* at p. 36 n. 9.

[13] See 39 Fed. Reg. 45309 (1974).

is clear that annuity income—whether from a private annuity or Social Security—is included in an individual's support if expended for that purpose.[14] For these reasons cases involving the inclusion of social security benefits—or any other annuity income—in support for purposes of determining dependency are not relevant to the issue at hand. We are here concerned not with an annuity, but health insurance benefits, and respondent attempts to distinguish benefits provided under a private health insurance program from benefits provided under a public health insurance program for purposes of determining support. It is this distinction we are confronted with and the distinction is without validity for the purposes of determining support under the income tax laws.

Respondent next argues that part A is not insurance because it is a "compulsory" program (while part B is voluntary). This distinction is without legal merit. An insurance program does not lose its insurance character simply because participation is compulsory. Even if this were true, the distinction respondent makes between parts A and B with regard to freedom of choice to participate is more illusory than real. An individual is not required to accept hospital benefits under part A (sec. 1814(a)(1), 42 U.S.C. sec. 1395f(a)(1)) and may purchase alternative or supplemental health insurance, if available (sec. 1803, 42 U.S.C. sec. 1395b). An individual who declines part A benefits is nevertheless required to pay the hospital insurance tax while foregoing the benefits provided. But this situation is analogous in some respects to part B. Whether an individual elects the part B coverage or not he will, as a general taxpayer, be required to underwrite the 50 percent of the program costs provided from general Federal revenues. An individual will be paying taxes to provide approximately half of the costs of both programs—part A through the employee's tax on his covered wages and part B primarily through the individual income tax, whether or not he participates in either program.

---

[14] It is a mystery why respondent identifies part A of tit. XVIII with the social security cash benefits provided by tit. II (rather than with part B of tit. XVIII) to reach this result. In the very ruling he relies on he also clearly states that *"neither* the basic Medicare benefits *nor* the supplementary Medicare benefits qualify as a 'pension or annuity.'" Rev. Rul. 70-341, 1970-2 C.B. 31, 32 (emphasis supplied). Respondent in this quotation recognizes that tit. XVIII is in its entirety a health insurance program as distinguished from the annuity program provided under tit. II.

Additionally, when a person reaches 65 and is eligible for hospital and related insurance benefits under part A, he is virtually compelled to take part B. It is impossible to find a commercially available plan equivalent to part B for a competitive premium since the Federal Government is paying one-half of the premium costs of part B. Additionally, the law presumes that an eligible individual elects part B coverage,[15] and premiums are automatically withheld from his social security or railroad retirement benefits (sec. 1840(a) and (b), 42 U.S.C. sec. 1395s(a)(1) and (2))[16] unless the individual takes affirmative action to elect out of the program. This presumed election, combined with the economic incentives of Government cost-sharing and the mechanical simplicity of the withholding of premium payments, has resulted in the participation of virtually all of those eligible for part B. Indeed, the Congress anticipated that up to 95 percent of the aged eligibles would participate in part B,[17] and the latest data indicate that this expectation has been fulfilled. The compulsion may be economic rather than juridical in part B, but from an empirical viewpoint, it has approximately the same coercive effect.[18]

Finally, social security has traditionally been a compulsory program for several reasons, including a desire to insure that individual workers will have prepaid benefit rights upon reaching retirement age and to guard against "antiselection." Antiselection would result if the public program underwrites the poor risks while the better risks seek private insurance protection. These are both factors attributable to the hospital insurance plan established by title XVIII, which covers the major portion of the health insurance costs of the elderly.[19]

---

[15] Sec. 1837(f) (42 U.S.C. sec. 1395p(f)) provides:

(f) Any individual—
(1) who is eligible * * *
(2) * * *
(3) * * *

shall be deemed to have enrolled in the medical insurance program established by this part.

[16] These are the principal sources of wage-replacement income for most of the nation's nearly 30 million aged and disabled.,

[17] H. Rept. No. 213, 89th Cong., 1st Sess. 3 (1965).

[18] The number of aged enrolled in part B had by July 1974 reached 21.2 million, about 95 percent of the total population aged 65 and over. 1975 Annual Report of the Board of Trustees of the Federal Supplementary Medical Insurance Trust Fund, H. Doc. No. 94-137 2 (1975).

[19] Part A benefits disbursed from the Hospital Insurance Trust Fund (including administrative expenses) in fiscal year 1974 were $8.1 million; the comparable figure for part B disbursed from the Supplementary Medical Insurance Trust Fund was $3.3 billion.

Additionally, the risk of antiselection in the prepaid part A program was probably of more concern in the health programs than the cash benefit program in view of the additional actuarial uncertainties the health program presented.[20]

Respondent's reliance on the apparent distinction between the juridical compulsion and empirical compulsion to participate in part A and part B is therefore without any substantive significance in resolving the issue before us.

Respondent contends that by not permitting an individual employee to deduct the hospital insurance portion of the tax under section 213 of the Internal Revenue Code of 1954, Congress indicated that the hospital insurance program was not insurance. This ignores the pattern of the legislative history wherein Congress consistently described all of title XVIII as an insurance program.[21]

---

Compare 1975 Annual Report of the Board of Trustees of the Federal Hospital Insurance Trust Fund, H. Doc. No. 94-136 1, with 1975 Annual Report of the Board of Trustees of the Federal Supplementary Medical Insurance Trust Fund, H. Doc. No. 94-137 1 (1975).

The manager of the House bill stated during floor debate:

"We picked this single biggest element, namely, the cost of being in a hospital, and we financed that by the payroll tax to let the person during his working years, through small amounts of money paid per week, per month, or per year, make advance payments to that trust fund entirely on his own and from his employer and by the self-employed on their own account. Remarks of Mr. Mills, 111 Cong. Rec. 7214 (1965)."

[20] See H. Rept. No. 213, 89th Cong., 1st Sess. 47 (1965). The factor of antiselection in the part B program was dealt with by empirical compulsion. The program was structured to integrate with the part A program as a unitary whole, so that virtually everyone was expected to follow his own economic interests (particularly in view of the economic compulsion imposed through financial incentives) and elect coverage. Additionally, the law included safeguards for antiselection under part B by providing limited enrollment periods, as well as increased premium contributions for those making a deferred election. (See also Meyers, Medicare 88 (Irwin 1970)). To the extent the voluntary versus compulsory distinction has any meaningful distinction in substance as opposed to form, it is attributable to the manner in which the legislation developed in Congress and tactical political considerations. See nn. 7 and 8 *supra*.

[21] Additionally, the problems associated with the tax treatment of premium contributions and benefits under Social Security are considerable to say the least. (See, for example, Joint Staff of House Comm. on Ways and Means and Senate Comm. on Finance, 91st Cong., 1st Sess., Tax Reform Studies and Proposals, U.S. Treasury Dept. 232-234 (Comm. Print 1965); Goode, The Individual Income Tax 105-110 (Brookings 1964). Congress may simply not have wanted to open up all of these problems in connection with the Medicare bill, which in itself presented enough problems. One problem that comes immediately to mind is how to treat refunds of taxes where an employee working for multiple employers pays taxes on excess wages, if the hospital insurance tax (as opposed to the remaining payroll tax) were deductible. Additional administrative problems would be presented and Congress, in declining to make the hospital insurance tax deductible, may have been concerned about these as well as the difficulty of explaining to the average man why only a portion of his payroll taxes could be deducted. Finally, Congress provided relief in 1965 to the working individual by permitting him to deduct a portion of his current health insurance premiums without regard to the 3-percent floor contained in sec. 213 of

Moreover, respondent's reasoning is a non sequitur. The deductibility for tax purposes of the costs incurred in acquiring health insurance coverage does not affect the insurance character of the program provided. The program may (and the hospital insurance program provided by part A does) provide a widespread pooling of risks against specified contingencies; provide various benefits specifically spelled out in the program; provide benefits as a matter of right to those in an insured status; and provide specific contribution rates determined in accordance with actuarial methods calculated to meet the estimated costs of the system. These are the relevant criteria, and whether or not a plan meets them is wholly unrelated to the deductibility for tax purposes of contributions to acquire an insured status.

DAWSON and HALL, *JJ.,* agree with this concurring opinion.

TANNENWALD, *J.,* dissenting: The majority accepts as the starting point of its reasoning respondent's concession that supplementary medical benefits paid under part B of title XVIII of the Social Security Act do not count in determining the total amount of "support" for purposes of section 152. See Rev. Rul. 70-341, 1970-2 C.B. 31. Compare Rev. Rul. 64-223, 1964-2 C.B. 50. They then argue that no distinction should be drawn between benefits paid under part A and part B. Ergo, the majority concludes that medical benefits paid under part A should similarly be excluded in determining the amount of total support.

In my opinion, we should not ride piggyback on respondent's concession as to a situation not presently before us, namely, how part B or private medical insurance benefits for which specific payment is made should be treated. Compare *Samples v. United States,* 226 F. Supp. 115 (N.D. Ga. 1963), with Rev. Rul. 70-341, *supra,* and Rev. Rul. 64-223, *supra.* See also *Mawhinney v. Commissioner,* 355 F. 2d 462 (3d Cir. 1966), affg. per curiam 43 T.C. 443 (1965). Respondent's rulings are clearly not binding upon us (see *Stubbs, Overbeck & Associates v. United States,* 445 F. 2d 1142, 1146-1147 (5th Cir. 1971)), and, whatever force they may have as a reflection of administrative interpretation of a statute available as an aid to construction (see *Hanover Bank v.*

the Code. Sec. 213(a)(2), I.R.C. 1954. See H. Rept. No. 213, 89th Cong., 1st Sess. 138 (1965).

*Commissioner,* 369 U.S. 672, 686 (1962)), the latter principle should have no bearing herein, where respondent's interpretation relied upon by the majority involves another issue and, indeed, respondent has in fact given the opposite construction with respect to the issue we are called upon to decide. See Rev. Rul. 70-341, *supra.*

In short, I believe we should address ourselves to the precise questions before us, namely, whether medical insurance benefits paid under part A are includable in determining the amount of total support and by whom they should be deemed contributed, and resolve those questions within the frame of reference of judicial decisions in comparable situations and without regard to the position respondent has taken in other contexts.

In *Helen M. Lutter,* 61 T.C. 685 (1974), affd. per curiam 514 F. 2d 1095 (7th Cir. 1975), benefits received by a mother from the State as "Aid to Families with Dependent Children" and as medical assistance were held to constitute total support, but not furnished by the mother.[1] We have reached the same conclusion with respect to amounts spent by the Wisconsin State Department of Public Welfare for an invalid child (*John L. Donner, Sr.,* 25 T.C. 1043 (1956)); the cost of support furnished by a State mental hospital;[2] welfare payments actually used for support (*Eddie L. Carter,* 55 T.C. 109 (1970)); cash grants from a county's department of social services;[3] and hospital services furnished without charge to a claimed dependent.[4] Finally, we have consistently held that social security payments received as old age and disability insurance benefits and used by the recipient for support constitute self-support.[5]

To my mind, medical benefits under part A are comparable to the benefits involved in the above-mentioned cases. Accordingly, I would hold that such benefits should be included in the amount of total support and that the amount of such benefits was contributed by the mother for her own support, with the result that petitioners did not furnish more than half of her support and are not entitled to claim her as a dependent for the purposes of sections 152 and 213.

RAUM, SIMPSON, and QUEALY, *JJ.,* agree with this dissent.

---

[1] See also *Hiram Johnson,* T.C. Memo. 1974-150.

[2] *H. B. House,* T.C. Memo. 1959-47.

[3] *John A. Frazier,* T.C. Memo. 1973-21.

[4] *Roy B. Abbott,* a Memorandum Opinion of this Court dated Feb. 9, 1954.

[5] See *Thomas J. Black,* T.C. Memo. 1972-135; *Glenn W. Kincheloe,* T.C. Memo. 1971-35; *Wilfred Abel,* T.C. Memo. 1962-192; *William H. Stang,* T.C. Memo. 1960-55.