MARY E. ARCHER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10128–77.     Filed February 28, 1980.

*Sondra R. Harris,* for the petitioner.

*William F. Halley* and *Michael N. Balsamo,* for the respondent.

OPINION

WILBUR, *Judge*: Respondent has determined an income tax deficiency of $1,400.32 for the calendar year 1974. The sole issue is whether petitioner may claim her mother as a dependent in 1974 pursuant to section 152(a).[1] This depends entirely on whether or not section 152(a) requires that Medicaid payments made on behalf of petitioner's mother for around-the-clock nursing care must be included in the support computation.

The parties have agreed that if this issue is resolved in favor of petitioner, petitioner is entitled to the following:

(1) A dependency exemption for her mother under section 151(e);

(2) The use of head-of-household tax rates under section 2(b);

(3) A medical deduction (after the 1-percent and 3-percent limitations) of $556.39, under section 213;

(4) A deduction for dependent care expenses of $3,439.77 under section 214; and

(5) The balance of the itemized deductions disallowed by respondent in the notice of deficiency, in the amount of $1,440.96.

The facts in this case were fully stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference. The facts necessary for an understanding of this case are as follows:

The petitioner is an individual who resided in Bronx, N.Y., at the time the petition in this case was filed.

During the year 1974, petitioner's mother, Mrs. Mary Archer (hereafter Mrs. Archer), resided with petitioner in petitioner's apartment in Bronx, N.Y. Mrs. Archer was an invalid during the entire year, having been permanently and totally disabled as a result of a stroke and diabetes. This disability left her unable to walk without assistance or to perform the simplest tasks for herself; she required assistance in bathing, dressing, and in all aspects of personal care. Because of her disability, Mrs. Archer required around-the-clock home health care services, which, during the year in question, were provided by Annie M. Ellerby, a licensed practical nurse.

Nurse Ellerby's services were restricted to nursing and other

---

[1]All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue, except as otherwise expressly indicated.

services in connection with the care of Mrs. Archer. Nurse Ellerby provided the following services for Mrs. Archer:

    (a) Gave physical therapy;
    (b) Administered oral medication as prescribed by a physician;
    (c) Changed linens for patient;
    (d) Changed patient's clothes;
    (e) Attended to patient's daily hygiene;
    (f) Cooked meals for patient; and
    (g) Provided entertainment for patient.

Nurse Ellerby did not drive Mrs. Archer anywhere in an automobile and did not clean house, wash clothes, do dishes (other than her own or her patient's), or perform any other household chores.

During 1974, it would have cost considerably more to maintain Mrs. Archer in a nursing home than to keep her at home. Because of her eligibility for Medicaid, any such cost, above Mrs. Archer's railroad retirement income, would have been paid out of public funds: city, State, or Federal.

The total amount expended for Nurse Ellerby's services during the year 1974 was $13,968.38. Of this amount, $6,569.81 was paid by a private medical insurance plan, $3,958.80 represented Medicaid payments paid by the New York City Department of Social Services, and $3,439.77 was paid by the petitioner as a contribution towards the support of her mother. It is the payments from the city of New York that are at issue here.[2]

The payments made by the New York City Department of Social Services were authorized by section 365–a(2)(d), tit. 11, art. 5, of the New York Social Services Law. N.Y. Soc. Serv. Law sec. 365 (McKinney 1976). Section 365–a(2)(d) includes within the definition of "medical assistance" the following:

(d) home health care services, including home nursing services and services of home aids and homemaker or housekeeping services in the recipient's home, if rendered by an individual other than a member of the family who is qualified to provide such services, where the services are prescribed by a physician in accordance with a plan of treatment and are supervised by a registered nurse;

---

[2]A total of $17,822.42 in expenses (including the $13,968.38 paid to Nurse Ellerby) were incurred by or on behalf of Mrs. Archer. Petitioner paid $4,147.85, Mrs. Archer contributed her $2,649 Railroad Retirement Plan receipts, $6,999.81 was paid by a private medical insurance plan, $66.96 was paid by Medicare, and $3,958.80 was paid by Medicaid. Respondent concedes that the amounts paid by the private medical insurance plan and by Medicare are not includable in the support computation.

Section 365-a is part of the New York State Medicaid program, administered as a plan for medical assistance meeting the requirements of title 19 of the Social Security Act, as amended, 42 U.S.C. sec. 1396 et seq. In this connection, section 1905(a)(7) of title 19, 42 U.S.C. sec. 1396d(a)(7), provides that the Federal Government will provide matching funds under the Medicaid program for State expenditures for "home health care services" on behalf of qualified individuals. Home health services, as pertinent to the issue before us, has been defined by the Department of Health, Education, and Welfare as:

*Section 440.70 Home health services.*

(a) "Home health services" means the services in paragraph (b) of this section that are provided to a recipient—

(1) At his place of residence, as specified in paragraph (c) of this section; and

(2) On his physician's orders as part of a written plan of care that the physician reviews every 60 days.

(b) Home health services includes—

(1) Nursing service, as defined in the State Nurse Practice Act, that is provided on a part-time or intermittent basis by a home health agency as defined in paragraph (d) of this section, or if there is no agency in the area, a registered nurse who—

(i) Is currently licensed to practice in the State;

(ii) Receives written orders from the patient's physician;

(iii) Documents the care and services provided; and

(iv) Has had orientation to acceptable clinical and administrative record-keeping from a health department nurse;

(2) Home health aide service provided by a home health agency;

(3) Medical supplies, equipment, and appliances suitable for use in the home; and

(4) Physical therapy, occupational therapy, or speech pathology and audiology services, provided by a home health agency or by a facility licensed by the State to provide medical rehabilitation services. (See sec. 441.15 of this subchapter.) [42 C.F.R. sec. 440.70 (1979).]

Pursuant to these statutes and regulations, the payments made by New York pursuant to its Medicaid program on behalf of petitioner's mother were provided as follows: 50 percent Federal Medicaid funds, 25 percent New York State Medicaid funds, and 25 percent New York City Medicaid funds.

Petitioner reported gross income for the year 1974 of $13,394.04. She used head-of-household tax rates pursuant to section 2(b) and claimed a dependency exemption for her mother under section 151(e), a deduction for medical expenses of $1,405.39 paid on behalf of her mother pursuant to section 213, and a deduction for dependent care expenses of $3,976.28 under

section 214, incurred on behalf of her mother. Respondent, in his deficiency notice, stated:

Since you failed to provide more than half of the support of your mother during the 1974 tax year, your deductions for medical expense of $1,405.39 and $3,976.28 for disabled dependents care services on her behalf are nondeductible personal expenses under section 262 of the Internal Revenue Code. Accordingly, your taxable income is increased by $1,405.39 and $3,976.28, respectively for the tax year 1974.

For the same reason, petitioner was denied a $750 dependency deduction under section 152 as well as head-of-household rates pursuant to section 2(b).

Section 152(a) permits a taxpayer to claim as one's dependent any of certain qualified individuals, including one's mother, if the taxpayer has provided more than half of that individual's support during the tax year in question. For each individual determined to be a dependent under the section 152(a) support test, the taxpayer may claim an additional personal exemption pursuant to section 151(e). In addition, section 213 allows the taxpayer to take medical expense deductions for certain expenditures made for the medical care of the taxpayer's "dependents (as defined in section 152)." Finally, section 214 as applicable to the year in issue, permits the deduction of dependent care services necessary for gainful employment.

To establish qualification for dependency status under section 152(a) and to take advantage of the consequent tax benefits under sections 151(e), 213, and 214, the taxpayer must establish the total support costs expended on behalf of the claimed dependent from all sources, and must also demonstrate that they provided over half of this amount. *Turecamo v. Commissioner*, 554 F.2d 564, 569 (2d Cir. 1977), affg. 64 T.C. 720 (1975), and cases cited therein. Sec. 1.152–1(a)(2)(ii), Income Tax Regs. The alternative computations of the parties are as follows:

| Support | Petitioner | Respondent |
|---|---|---|
| Nurse Ellerby | $3,439.77 | $7,398.57 |
| Physical therapist | 1,302.00 | 1,302.00 |
| Shelter, food, and utilities | 1,500.00 | 1,500.00 |
| Clothing and linens | 300.00 | 300.00 |
| Insurance premiums | 54.24 | 54.24 |
| Medicine and drugs | 156.27 | 156.27 |
| Appliances (medical) | 44.57 | 44.57 |
| Total | 6,796.85 | 10,755.65 |

| Source of support | Petitioner | Respondent |
|---|---|---|
| Petitioner | $4,147.85 | $4,147.85 |
| Petitioner's mother | 2,649.00 | 2,649.00 |
| New York City | --- | 3,958.80 |
| Total | 6,796.85 | 10,755.65 |

The only issue dividing the parties is whether or not the $3,958.80 paid pursuant to Medicaid for home health services provided by Nurse Ellerby to petitioner's mother is includable in the support equation. Accordingly, this case, like *Turecamo v. Commissioner*, 64 T.C. 720 (1975), affd. 554 F.2d 564 (2d Cir. 1977), turns on the proper treatment of third-party medical payments in determining who has provided more than half the support of an individual for dependency exemption purposes.

Petitioner contends that the Court should focus on the nature of the Medicaid payments in this case and conclude that the payments are not includable in the support computation because the payments were applied to satisfy extraordinary medical expenses. Petitioner asserts that the historical development of section 152(a) shows a clear progression toward the exclusion from the support computation of third-party payments of extraordinary medical expenses. Petitioner also contends this interpretation is consistent with the policy underlying both section 152 and the Medicaid program.

Respondent asserts that extraordinary medical payments are includable in the support computation unless the payments constitute either the proceeds of a private medical insurance policy or benefits paid pursuant to a Government program that provides essentially the same health insurance coverage as is furnished by private medical insurance plans. Conceding that Medicare payments fit into this category and are excludable, respondent distinguishes Medicaid and Medicare on the theory that the former is a general welfare program with disbursements determined by the pecuniary need of the recipient, and. the latter program is in the nature of medical insurance.

In explaining why we agree with petitioner, it may be helpful to begin with a brief review of the treatment (for purposes of the support equation) of third-party payments for extraordinary medical expenses. In Rev. Rul. 64-223, 1964-2 C.B. 50, the Commissioner ruled that the premiums paid for a private health insurance policy, rather than the benefits received, are includable in the support equation. In Rev. Rul. 70-341, 1970-2 C.B. 31,

revoked in part, Rev. Rul. 79–173, 1979–1 C.B. 86, the Commissioner extended this ruling to benefits paid pursuant to part B of Medicare (providing physician's services and related benefits and funded by general Federal revenues and premium contributions from participants), while making it specifically inapplicable to part A of Medicare (providing hospitalization and related benefits and funded largely from an excise tax on wages). This attempt to treat part A of Medicare differently from part B and from private health insurance was repudiated by the courts. *Turecamo v. Commissioner*, 64 T.C. 720 (1975), affd. 554 F.2d 564 (2d Cir. 1977). The Service has announced that it will follow the decision in *Turecamo* (Rev. Rul. 79–173, 1979–1 C.B. 86).

We focus in this case on Medicaid, a program designed to provide third-party vendor medical payments on behalf of needy individuals. The beneficiaries of Medicaid are individuals who are receiving cash assistance benefits for their basic living expenses pursuant to various provisions of the social security law based on need, and also individuals who have sufficient income to meet their basic needs but who are "medically indigent"—those who, unless they receive medical assistance, will be likely to require cash assistance. While the eligibility in each case must be based on reasonable needs standards, once eligibility is provided, a comprehensive benefit package, varying in scope from State to State, is insured by virtue of the provisions of title 19 of the Social Security Act, 42 U.S.C. sec. 1396 et seq.[3] The definition of medical assistance is contained in section 1905, 42 U.S.C. sec. 1396d(a), and includes in-patient and out-patient hospital services, services in a skilled nursing facility, and physician services. These specified services are generally the minimum that must be included in any State plan (see sec. 1902(a)(13)(B), 42 U.S.C. sec. 1396a(a)(13)), but a broader array of medical services may also be provided.

In some cases, the definition of services is directly keyed into title 18 (Medicare)—for instance, section 1905(a)(6), 42 U.S.C. sec. 1396d(a)(5), defines physician services by reference to section 1861(r)(1), 42 U.S.C. sec. 1395x(r)(1). Additionally, many of the States, once eligibility is established, issue Medicaid cards

[3]See R. Myers, Medicare, 263 et seq. (Irwin 1970); R. Stevens, "Medicaid: Anatomy of a Dilemma," 3 Law & Contemp. Prob. 348 (1976); S. Rept. 404 (Part 1), to accompany H.R. 6675 (Pub. L. 89–97), 89th Cong., 1st Sess. 73 et seq. (1965); S. Rept. 744, to accompany H.R. 12080 (Pub. L. 90–248), 90th Cong., 1st Sess. 32, 175 (1967).

that are much like those issued under Medicare. Thus, aside from basing eligibility on need, the benefits provided under the Medicaid program are similar to those provided under Medicare and private health insurance plans.

It is likely that in almost all instances, a dependent parent who receives in-patient or out-patient medical services of any magnitude will be the beneficiary of a large third-party payment either from: (a) Private health insurance, such as an individual retired from the Government might have under the Federal Employees Health Benefit Act; (b) Medicare, part A and part B (possibly supplemented by private insurance as to deductibles and coinsurances); and/or (c) Medicaid. Respondent contends that health care benefits provided by private health insurance and Medicare do not enter into the support equation, but benefits pursuant to Medicaid are includable in the support equation. Under respondent's interpretation, if three elderly parents (one covered by private insurance, one covered by Medicare, and one covered by Medicaid) all live in the same block and are treated by the same physician at the same hospital for the same conditions with the same result, the children supporting the first two parents would be entitled to a dependency exemption, head-of-household rates, and a deduction for related medical and dependent care expenses, but the child whose parent is covered by Medicaid would be denied those benefits.

Unlike respondent, we do not interpret the applicable law as mandating these sharp horizontal inequities. A child supporting an aged parent is for the most part required to accept the kind of health care protection the parent has—whether it is private insurance, Medicare, or Medicaid. It is often difficult to get private insurance for someone over 65, particularly at an affordable price, unless he already has it, which was one of the main reasons for enacting Medicare.[4] If the parent does not have private health insurance or Medicare, Medicaid will undoubtedly have to pay his extraordinary medical expenses. Large third-party payments based on a health contingency either insured against or covered by Medicaid ought not deprive individuals of a dependency exemption for their parents. In both cases, to include these large contingent third-party payments in the

---

[4]See H. Rept. 213, to accompany H.R. 6675 (Pub. L. 89–97), 89th Cong., 1st Sess. 20 (1965).

support equation distorts the economic relationship between the taxpayer and his aged parent. In this connection, the Second Circuit in *Turecamo* affirmed the Tax Court decision "on two separate analytical grounds" (554 F.2d at 568).[5] In addition to specifically determining that Medicare was sufficiently like private insurance to be treated comparably, the court also held:

Mrs. Kavanaugh relied on the taxpayers for the bulk of her normal living costs plus the medical costs for which she would have otherwise been responsible. The fact that certain providers of hospital services received more in Medicare payments from the Federal government on her behalf than Mrs. Kavanaugh received in support from the Turecamos did not change this basic financial relationship. The random and contingent receipt of insurance benefits, whether in [the] form of private insurance proceeds or Basic Medicare benefits under Part A, interrupts but does not alter the otherwise established economic relationship between the beneficiary, Mrs. Kavanaugh, and the Turecamos, who regularly contributed to her support. * * * [554 F.2d at 576. Fn. ref. omitted.][6]

To require that Medicaid payments be included in the support equation but not Medicare and private insurance means that those individuals whose parents are the neediest will be the least likely to get a dependency exemption for supporting them and be able to deduct medical expenses they pay on their behalf. This distinction will not only be lost on the average individual but seems exceedingly unfair and contrary to the basic thrust of the Medicaid program itself.

While there are distinctions between the Medicare and Medicaid programs, they should not be overemphasized to

---

[5]On this point, the court also unequivocally stated:

"We are led to the same conclusion *independent of this analysis of the statutory provisions of Part A* and the comparison of it with other benefits. In the present case, a consideration of the absence of economic impact of the receipt of Part A benefits on the recipient's financial relationship with the Turecamos convinces us that Part A benefits should not be included as an element of the recipient's total support. [*Turecamo v. Commissioner*, 554 F.2d 564, 568 (2d Cir. 1977), affg. 64 T.C. 720 (1975). Emphasis added.]"

See also 554 F.2d at 575, 576.

[6]In this connection, the Second Circuit adopted the following statement:

"The average man looks at his health costs as his insurance premiums plus his unreimbursed payments for health care, which accords with the economic realities (and the amount deductible as a medical expense.) Viewing large third party payments (made when the contingency insured against occurs) as support can be viewed as distorting the economic realities. [554 F.2d at 576.]"

The court then concluded that:

"Such a distortion of economic realities would result in this case if the amount of Part A benefits actually paid out on behalf of Mrs. Kavanaugh were included in her aggregate support calculations for the purposes of the support dependency tests of sec. 152(a) of the Code. * * * [554 F.2d at 576.]"

justify such an idiosyncratic result. An individual retired under Medicare pays no current premiums for part A (this is covered by the tax imposed on current workers and their employers) and a small premium for part B which covers approximately half of the cost of that program, the other half being paid by the Federal Government from general revenues.[7] Only in private health insurance are premiums of any real significance to an aged parent, and even in these instances, the premiums are infinitely small in relation to the large third-party payments that are made for health care when an insured contingency arises.

And premiums also can be of some significance in the Medicaid program, making it more difficult to put Medicare and Medicaid in the two completely separate boxes respondent recommends. We note that the States are permitted under certain circumstances to require some premium contribution by Medicaid participants. Section 1902(a)(14)(B), 42 U.S.C. sec. 1396a(14)(B)(i), provides with respect to individuals who are covered by Medicaid but who are not receiving cash assistance benefits, that:

there may be imposed an enrollment fee, premium or similar charge which (as determined in accordance with standards prescribed by the Secretary) is related to the individual's income * * *

Additionally, section 1843, permits the States to "buy-in" their aged Medicaid recipients under part B of the Medicare program.[8] Pursuant to section 1843, a State, by paying the appropriate premium, may purchase coverage under part B of Medicare for

---

[7] Indeed, anyone age 65 or over when Medicare was adopted in 1965 was covered without ever having paid a health insurance premium. Many others were "blanketed-in" without ever having paid social security taxes of any kind. See R. Myers, Medicare, 89, 92 (Irwin 1970).

[8] Act of Aug. 14, 1935, ch. 535, tit. 18, sec. 1843, as amended, provides:

State Agreements for Coverage of Eligible Individuals Who Are Receiving Money Payments Under Public Assistance Programs (or Are Eligible for Medical Assistance)

*Sec. 1843.* (a) The Secretary shall, at the request of a State made before January 1, 1970, enter into an agreement with such State pursuant to which all eligible individuals in either of the coverage groups described in subsection (b) (as specified in the agreement) will be enrolled under the program established by this part.

(b) An agreement entered into with any State pursuant to subsection (a) may be applicable to either of the following coverage groups:

(1) individuals receiving money payments under the plan of such State approved under title I or title XVI; or

(2) individuals receiving money payments under all of the plans of such State approved under titles I, X, XIV, and XVI, and part A of title IV. * * *

individuals over age 65 who may be eligible for Medicaid payments in that State. Obviously, in these cases, even though the benefits are payable pursuant to title 18, the eligibility of the individuals who are "brought-in" is determined on the basis of need under title 19. Since the State provides part B insurance benefits on the basis of a needs standard, respondent's theory would require that the benefit disbursements during illness, rather than the premiums paid by the State to acquire coverage, be included in the support equation. Again, two individuals whose elderly parents receive precisely the same benefits under part B of title 19 (Medicare), will be treated dramatically different for tax purposes.

Respondent rationalizes this peculiar result by reference to a line of cases holding that cash social security benefits to retired and disabled individuals, and cash public assistance benefits (and equivalent payments) to needy individuals to meet their everyday needs are included in the support equation. See *Carter v. Commissioner*, 55 T.C. 109 (1970).[9] Virtually all of the cases respondent cites involve cash payments (or their in-kind equivalent) to meet the ordinary daily living expenses of the individuals involved rather than extraordinary medical expenses—and they all precede our decision and the decision of the Second Circuit in *Turecamo*. And this distinction is significant, for as the Second Circuit emphasized in *Turecamo:*

> The receipt of annuity proceeds by an individual in need of financial assistance has an altogether different effect on his economic relationship with a third party who contributes to his support. The regular receipt of predictable payments through private annuities or public welfare annuities such as OASDI may be understood to reduce the recipient's dependency on the contributing third party on a continuing basis, to the extent of the annuity or welfare benefits being received. Such was the case of Mrs. Kavanaugh in 1970, and the taxpayers readily concede that the $1,140 in social security benefits she received properly constitute support attributable to her for purposes of the section 152(a) dependency support test. *See* Rev. Rul. 64–222, 1964–2 C.B. 47. [554 F.2d 576 n. 27.]

---

[9] Cf. *Black v. Commissioner*, T.C. Memo. 1972–135 (cash social security payments); *Morrison v. Commissioner*, T.C. Memo. 1975–73, and *Johnson v. Commissioner*, T.C. Memo. 1974–150 (cash public assistance payments under the Aid to Family with Dependent Children (A.F.D.C.) Program). Respondent also places unwarranted emphasis on *Lutter v. Commissioner*, 61 T.C. 685 (1974), affd. per curiam 514 F.2d 1095 (7th Cir. 1975), cert. denied 423 U.S. 931 (1975). In *Lutter*, the only issue was whether public assistance and medical assistance payments could be considered support provided by *petitioner*. In the context of the issue as presented by the parties, we assumed, without deciding, that medical assistance was included in the support equation.

In view of this compelling statement by the Second Circuit, as well as the reasons set out earlier in this opinion, we believe it is more appropriate to treat cash payments (or their in-kind equivalent) made to cover everyday living expenses, whether they are cash social security payments or cash public welfare payments, as similar items for purposes of the support equation. Similarly, we believe extraordinary medical expenses—whether paid pursuant to Medicare or Medicaid—should be treated as similar items.[10] Respondent, in asking us to compare extraordinary medical expenses under Medicaid with cash insurance benefits under the social security law, is comparing apples and oranges. Additionally, by lumping Medicaid and cash social security benefits together for similar treatment, he undermines his argument that the includability of extraordinary medical payments within the support equation turns solely on whether they are made pursuant to an insurance program or a welfare program.

In conclusion, the distinction respondent makes between payments under Medicare and Medicaid cannot survive the rationale of *Turecamo*, is wrong as a matter of fairness and policy, and encounters considerable practical difficulties in view of the interlocking nature of Medicare and Medicaid. We therefore hold for petitioner.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

TANNENWALD, *J.*, concurring: In view of our decision in *Turecamo* and its affirmance by the Second Circuit Court of Appeals, I believe that there should be no distinction between Medicaid and Medicare payments. Accordingly, I concur in the result reached by the majority. However, I still continue to adhere to the views expressed in my dissenting opinion in

[10]We emphasize that respondent in no way argues that the home health services and other health care provided in the instant case are not health care payments that would be excluded from the support equation pursuant to his rulings if paid pursuant to private insurance or Medicare. In fact, respondent has followed this principle in excluding some of the payments made in this case, and his argument for treating the programs differently is based *solely* on his distinction between extraordinary medical payments made pursuant to an insurance program on the one hand and those made pursuant to a need standard on the other hand.

*Turecamo* (see 64 T.C. at 739–740); under the views expressed therein, I would, absent *Turecamo*, reach the opposite result herein.

NIMS, *J.*, dissenting: The majority excludes Medicaid payments from the support computation under section 152(a). "Support" for purposes of section 152(a) has great breadth. Although the term has no statutory definition, it is defined in the regulations to include "food, shelter, clothing, medical and dental care and the like" (sec. 1.152–1(a)(2)(i), Income Tax Regs.), and to include "income which is ordinarily excludable from gross income, such as benefits received under the Social Security Act" (sec. 1.152–1(a)(2)(ii), Income Tax Regs.). Public welfare and social security benefits have always been included in the support computation. Thus, for example, in *Donner v. Commissioner*, 25 T.C. 1043 (1956), the cost of maintaining an invalid child in a facility operated by the Wisconsin State Department of Public Welfare was included in the support computation. See also *Newman v. Commissioner*, 28 T.C. 550 (1957). In *Carter v. Commissioner*, 55 T.C. 109 (1970), cash old-age assistance payments provided by the State were likewise included.[1]

*Lutter v. Commissioner*, 61 T.C. 685 (1974), affd. per curiam 514 F.2d 1095 (7th Cir. 1975), cert. denied 423 U.S. 931, perhaps best exemplifies the breadth to which both the Commissioner and taxpayers thought the support computation extended. In that case, there was no dispute as to whether cash payments and medical assistance provided by the State of Illinois for the

---

[1]The general rule has also been consistently applied by this Court with regard to the following payments: Cash social security payments (*Black v. Commissioner*, T.C. Memo. 1972–135); cash disability insurance benefits under sec. 202, tit. II of the Social Security Act (*Kincheloe v. Commissioner*, T.C. Memo. 1971–35); cash public assistance provided by State, county or local departments of public welfare (*Fisher v. Commissioner*, T.C. Memo. 1978–492; *Frazier v. Commissioner*, T.C. Memo. 1976–149, affd. per curiam 551 F. 2d 1118 (8th Cir. 1977), cert. denied 434 U.S. 957; *Beck v. Commissioner*, T.C. Memo. 1970–153; *Batchelor v. Commissioner*, T.C. Memo. 1970–24); cash payments under the Aid to Families with Dependent Children (A.F.D.C.) program (*Morrison v. Commissioner*, T.C. Memo. 1975–73; *Johnson v. Commissioner*, T.C. Memo. 1974–150); free lunches under the A.F.D.C. program (*Morrison v. Commissioner, supra*); mortgage assistance and utilities assistance by governmental agencies paid directly to the mortgagees and to the providers of the utilities (*Leggett v. Commissioner*, T.C. Memo. 1976–7); food stamps (*Leggett v. Commissioner, supra*); and medical and dental assistance paid directly to the providers, by social service agencies (*Leggett v. Commissioner, supra*).

benefit of petitioner's children and paid directly to the providers of the medical services were includable in the support computation. Both parties were convinced that the payments were includable. At issue was whether the payments could be deemed support furnished by the petitioner (the mother of the children who qualified for such assistance) or by the State of Illinois. We held that the payments were support furnished by the latter.

As the majority correctly notes, there is an exception to the otherwise broad "support" definition relating to medical expenses. But in marching through the history of this exception, the majority makes one pointed omission; the majority fails to indicate the reason for this exception. Medical payments have been excluded from the support computation when their inclusion would potentially duplicate premium payments. Thus, the Commissioner ruled that medical payments paid pursuant to a health insurance policy should be excluded from the support computation (Rev. Rul. 64–223, 1964–2 C.B. 50), and that certain Medicare payments (supplementary Medicare) should be excluded in the support computation (Rev. Rul. 70–341, 1970–2 C.B. 31, revoked in part Rev. Rul. 79–173, 1979–1 C.B. 86).

In *Turecamo v. Commissioner*, 64 T.C. 720 (1965), affd. 554 F.2d 564, 569 (2d Cir. 1977), we extended the Commissioner's ruling regarding supplementary Medicare payments to basic Medicare payments on the ground that both constituted vital components of a comprehensive health insurance system. We found the cited funding differences upon which the Commissioner predicated his disparate treatment of the two programs to be due more to political exigencies than to substantive differences between the two programs. Thus, our decision in *Turecamo* was piggy-backed onto the determination that supplementary Medicare payments should be excluded from the support computation to avoid duplication.

Here, we deal with Medicaid. Medicaid and Medicare were the product of the same legislation, but any attempt to equate Medicaid payments with Medicare payments and insurance proceeds is simply at odds with the history and structure of the two programs. The Medicare program was very definitely designed as a comprehensive health insurance plan. (*Turecamo v. Commissioner*, 554 F.2d at 571.) It is funded out of an actuarially sound fund made up of periodic contributions (554 F.2d at 751), and it affords essentially the same type of health

insurance protection as a private insurance plan. Medicaid, by contrast, is simply a welfare program. Its roots are found in other welfare programs;[2] it was intended as a welfare program;[3] and it was structured along the lines of a welfare program. Eligibility for Medicaid is based on need and does not depend in any way upon the past payment by the recipient of any particular type of Federal, State, or local taxes. Financed out of the general fisc as it is, Medicaid payments are not duplicative of other payments that have already been included in an individual's support computation.

Thus, while insurance payments and Medicare payments have been excluded from the support computation to avoid duplication, Medicaid is fundamentally different. There is no more justification for excluding health welfare payments from the support computation than there is for excluding any other type of welfare payment from the support computation. The disposition of this case should be controlled by *Donner* and *Lutter* rather than by *Turecamo*.

The majority attempts to play down the distinctions between Medicaid and Medicare by pointing out that States can elect to pay appropriate premiums to "buy-in" their aged Medicaid recipients. Here, we are not faced with a situation where a State has "bought-in" its aged Medicaid recipient and it is unclear that any States have made that statutory election. More important, though similarities in the Medicaid and Medicare programs do exist, they do not negate the fundamental differences between the two programs. These differences stand in sharp contrast to the superficial distinction between basic Medicare and supplemental Medicare that led to our decision in *Turecamo*.

Other than generalized public policy concepts, the only real authority cited by the majority for its position is the Second Circuit's opinion in *Turecamo*. The majority correctly noted that the Second Circuit determined that basic Medicare payments must be excluded from the support computation because their inclusion would distort the economic realities of the relationship between the taxpayer and the putative dependent. The majority

---

[2] S. Rept. 404, to accompany H.R. 6675 (Pub. L. 89–97), 89th Cong., 1st Sess. 1945, 1950 (1965).

[3] Indeed, the reason that the Kerr-Mills medical assistance program, the predecessor program to Medicaid, was structured as a welfare program was specifically to make a social insurance approach unnecessary. R. Myers, Medicare 39 (Irwin 1970).

draws on this language to justify the exclusion of Medicaid payments as well.

Unfortunately, the Second Circuit's discussion of economic distortion was more sophisticated than the simple medical-costs-are-high-so-let's-exclude-them approach of the majority. Despite what the majority characterizes (n. 5) as the Second Circuit's "unequivocal state[ment]" that its economic distortion analysis was independent of its so-called statutory analysis, that Court took great pains in analyzing the economic distortion to indicate that the Medicare payments were in the nature of medical insurance. (554 F.2d at 575–576.) This suggests that the Court's finding in that regard was a necessary predicate to its economic distortion analysis.

Medical insurance benefits can distort the support calculation not merely because the payments can be disproportionately large, as the majority notes, but because, as a practical matter, one's medical cost is not the full cost of the medical bill but only the cost of insurance premiums plus amounts not covered by the insurance. By way of explanation, the Second Circuit quoted from the concurring opinion in *Turecamo:*

The average man looks at his health costs as his insurance premiums plus his unreimbursed payments for health care, which accords with the economic realities (and the amount deductible as a medical expense). Viewing large third-party payments (made when the contingency insured against occurs) as support can be viewed as distorting the economic realities. [554 F.2d at 576.]

Basic Medicare merited the same treatment accorded private health insurance because its insurance-like nature meant that the realistic economic cost of a particular health problem was the cost of the Medicare premiums, not the cost of the health care. It was that economic reality that the Second Circuit did not want to upset.

In this respect, the general welfare-insurance distinction makes perfect sense. To the extent that medical costs are satisfied by Government payments pursuant to a program that is in the nature of insurance, the economic cost to the individual is, as a practical matter, the cost of premiums for the insurance-like protection. That cost is the proper amount to include in the support computation; including the full medical cost would distort the economic reality. By contrast, if the medical cost is one that goes unsatisfied by insurance, either private or Government, the cost to the individual is the full cost, and that

full amount should be included in the support computation. This is true whether the cost is paid by the putative dependent or by a third-party individual or by welfare.

Moreover, as to at least part of Medicare, a taxpayer will have made some contribution toward the excluded benefits, whereas the exclusion of Medicaid payments is simply an opportunity to "double-dip" the Government—such taxpayer's needy dependent receives the support payments which the taxpayer would somehow otherwise have to provide, and the taxpayer gets a tax benefit to boot.

The majority stresses the extraordinary nature of medical costs, both in purporting to distinguish this case from the welfare payment cases and also in tying its result into the Second Circuit's self-styled "independent reason." Unfortunately, on these facts, the majority's argument is forced and its "comparing apples and oranges" criticism of respondent is inapposite.

The costs covered by Medicaid in this case were extended costs resulting from a major medical catastrophe and not the extraordinary one-shot costs which, in the year incurred and paid, arguably distort the economic relationship between the supported and his or her benefactor. They consisted of relatively modest weekly payments for home nursing care and they resemble other day-to-day support costs of Mrs. Archer or the proceeds of disability insurance. Indeed, despite the solace drawn by the majority from the same passage in *Turecamo*, the Second Circuit's comment on the welfare and social security line of cases (554 F.2d 576 n. 27), seems to suggest that these Medicaid payments should be treated in a similar fashion:

> The receipt of annuity proceeds by an individual in need of financial assistance has an altogether different effect on his economic relationship with a third party who contributes to his support. The regular receipt of predictable payments through private annuities or public welfare annuities such as OASDI may be understood to reduce the recipient's dependency on the contributing third party on a *continuing* basis, to the extent of the annuity or welfare benefits being received. [Emphasis added.]

The mere fact that the costs in this case are tied to medical or health problems thus becomes coincidental, and does not mean that these costs should be treated in a different manner than other day-to-day routine costs.

Individuals like petitioner who assume financial responsibility

for their aged and infirm parents merit the highest respect of all citizens. I also recognize that, because of the nomenclature used, the distinction between Medicaid and Medicare payments may be lost on the average individual. Nevertheless, I perceive no basis for treating Medicaid payments any differently than other welfare payments. In my opinion, they should be included in the support computation, and I would so hold.

SIMPSON, QUEALY, and CHABOT, *JJ.*, agree with this dissenting opinion.